# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **JEREMY DeFOUR,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22CV00379 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **LIEUTENANT WEBBER,** | ) | JUDGE JAMES P. JONES |
| **ET AL.,** | ) | |
| Defendants. | ) | |
| | ) | |

*Jeremy DeFour, Pro Se Plaintiff; Laura E. Maughan and Anne M. Morris, Assistant Attorneys General, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE AND PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants.*

Plaintiff Jeremy DeFour, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, asserting that the defendant prison officials were deliberately indifferent to his safety, retaliated against him, and denied him due process. The defendants have filed a motion seeking summary judgment. DeFour has filed motions for summary judgment against different groups of defendants, as well as motions for sanctions. After review of the parties' submissions, I conclude that the defendants' motion must be granted and that DeFour's motions must be denied.

# I.   BACKGROUND.

## A. *DeFour's Allegations and Evidence.*

DeFour is in the custody of the Virginia Department of Corrections (VDOC). In June of 2022, DeFour filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that officials at Buckingham Correctional Center (BKCC) had retaliated against him in several unrelated incidents.  The court severed the case into several separate civil actions, including this one.  This case consists of allegations designated by the court as Claim (5), alleging deliberate indifference, retaliation, and due process violations.  DeFour filed a Second Amended Complaint in this case that I will consider as his operative pleading.

On May 31, 2022, DeFour was talking to a "pod mentor" (inmate Pridgen) at DeFour's cell in D2 Pod when another inmate named Vickers came up and accused DeFour of being "informant" and a "rat."[1]  Second Am. Compl. ¶ 16, ECF No. 16. Vickers claimed that "DeFour gave his supervisor Lt. Webber information about him breaking prison rules."  *Id.* ¶ 17.[2]  When Vickers made threatening gestures and comments, Pridgen pulled Vickers into the cell, held him down on the floor, and told

---

[1]  This summary of events underlying DeFour's claims is stated in the light most favorable to him and determines no findings of fact.

[2]  I have omitted internal quotation marks, alterations, or citations here and throughout this Opinion, unless otherwise noted.

him to calm down before letting him up. Vickers left the cell, but he made additional threats.

About an hour later, DeFour and Pridgen left the area to talk to Webber's supervisor "about Webber spreading the rumor that [DeFour] was an informant." *Id.* ¶ 21. Vickers "was in a Blind Spot near the exit" and "assailed" DeFour from behind. *Id.* ¶¶ 22–23 . Pridgen jumped in to stop Vickers. Both Pridgen and DeFour suffered injuries and were transported to a local emergency room for treatment. DeFour's injuries to his cheek, sinus cavity, back, and shoulder required stitches. DeFour states that Vickers "suffered minor scrapes and cuts." *Id.* ¶ 28.

Other inmates allegedly reported to DeFour that Webber had told other inmates that [DeFour] was an informant." *Id.* ¶ 31. DeFour also complains that Webber had recently authorized two "false" disciplinary charges against him.[3] *Id.* ¶ 33. On May 26, 2022, just days before the altercation with Vickers, Webber authorized a third charge against DeFour. That day, DeFour encountered defendant Beaty (referred to in some submissions as defendant Bates), and DeFour accused her of violating policy. Thereafter, Beaty brought a disciplinary charge against DeFour for threatening to commit aggravated assault on a non-offender. Instead of asking her supervisor, Beaty got Webber to authorize this charge. A senior officer

---

[3] DeFour makes no claim in this case concerning these two prior charges and appears to offer them merely as background for his past experiences with Webber.

witnessed the exchange between Beaty and DeFour and told Webber that no threat of bodily harm had occurred.  Webber nevertheless authorized the charge.  That senior staff member offered a statement to Disciplinary Hearing Officer (DHO) Stanton (referred to in some submissions as DHO Forbes).  But Stanton, allegedly conspiring with Webber and Beaty, excluded the staff member from the hearing, found DeFour guilty of the charge, and sanctioned him.  After the incident on May 31, 2022, officials moved DeFour to a restrictive housing unit (RHU), pending an investigation of the incident.

After the May 31, 2022, incident with Vickers and Pridgen, DeFour was "taken to segregation[4] and held under investigation." *Id.* ¶ 40..  In July 2022, Rosson, as a senior intelligence officer, wrote a disciplinary charge against DeFour for aggravated assault related to events on May 31, 2022.  Rosson stated during the hearing that there is "no evidence such as a witness or camera footage that shows [DeFour] attack, assault, or in any physical contact with any one at any time." *Id.* ¶ 42. Stanton allegedly "denied [DeFour] his right to call witnesses, was not objective, and found [him] guilty" with no evidence that he made physical contact with anyone that day. *Id.* ¶ 49.

---

[4]  DeFour refers to this detention as "segregation."  Evidence in the record indicates that prison officials refer to the separate housing unit in which DeFour, Pridgen, and Vickers were placed as the Restorative Housing Unit (RHU), a term that I will use in this Opinion.

DeFour alleges that while serving paperwork about the assault charge, defendant Randolph failed to "fulfill a required signing/certifying" to signify that DeFour had been advised of his due process rights and penalty offer, although he had refused to sign the document. *Id.* ¶ 48. To prevent the charge from being dismissed, Randolph and Stanton allegedly "conspired" to alter the document to add a signature/certification. *Id.* Defendants Bryant and Edmonds then accepted the altered report and certified the charge. Bryant and Edmonds later submitted a report stating that "security camera footage confirms that Randolph initially failed to certify the Report but returned minutes later to do so." *Id.* DeFour claims their interpretation of the video footage is "false."[5] *Id.*

Among many documents that DeFour submits to the court to support his claims is the incident report prepared about the May 31, 2022, events. Stmt. Disp. Facts Attach. D, at 13, ECF No. 64-2. He also asks the court to review the video clips in the record, ECF Nos. 68 and 96, and the audio recording of the hearing on the assault charge, ECF No. 89, and I have done so. According to the report and my review of the video clips, surveillance video from Cameras 920D, 921D, and 924D of D2 pod shows Vickers standing at DeFour's cell for some time. At about 2:34 p.m., Pridgen tries to pull Vickers into the cell, but Vickers resists. Ultimately, he

---

[5] In later submissions, DeFour specifically contends that the available video footage does not show Randolph making a second visit to his cell with paperwork about the charge, as Bryant and Edmonds have stated.

is pulled into the cell, and the door closes. About a minute later, Vickers leaves the cell and the area.

Video from Camera 902 in the First Floor Hall shows Vickers in the entryway of C and D building at about 3:32 p.m. It shows DeFour and Pridgen exiting D2 pod and going into the entryway at about 3:35 p.m. On the video, when Pridgen gets to the entryway door, he appears to speed up his pace as though responding to events inside. Seconds later, a man's foot and leg slide out the door briefly, and the man is then pulled back into the entryway out of sight. The video does not show how the inmates interacted inside the entryway. Video from Camera 1001 shows the three inmates stumble together out of C/D building onto the sidewalk at a little after 3:36 p.m. It shows DeFour and Pridgen reenter the building, while Vickers remains outside and sits down on the grass. Just after 3:37 p.m., video from Camera 902 in the First Floor Hall shows DeFour and Pridgen reentering the hallway with blood spots on their shirts, which does not appear on the earlier Camera 902 footage of them.

The incident report indicates that staff members later escorted all three inmates to the medical unit for assessment of their injuries. A nurse reported that Vickers had several small puncture wounds on his arms and back and swollen areas on the right side of his face and the back of his head and neck. He was treated on site and transferred to the RHU. The report indicates that DeFour suffered stab

-6-

wounds to his left shoulder joint and another stab wound to his cheek and had a tooth knocked out.  The report describes Pridgen's injuries as two deep lacerations to his left shoulder and side.

The report includes summaries of an investigator's attempts on July 11, 2022, to question each of the three inmates about the incident.  Vickers refused to make any statement, and Pridgen said he merely tried to intervene in a scuffle between other inmates and was not willing to testify against anyone because he did not know who, if anyone, had stabbed him.  According to the report, DeFour waived his Miranda Rights and told the investigator, "[H]e had no problems with either inmate and believe[d] he fell and cut himself," and "didn't want any charges against anyone and he didn't do anything."  Stmt. Disp. Facts Attach. D, at 18, ECF No. 64-2.

Stanton found DeFour guilty of the aggravated assault charge and sanctioned him with 90 days loss of phone calls and 90 days loss of visitation.  The guilty finding and sanctions were approved by Ross, Moore, Bryant, and Edmonds.  Because of the disciplinary infraction, officials also increased DeFour's security level, a classification change that resulted in his transfer to a higher security prison and assignment to indefinite segregation.

DeFour remained in the RHU for several months.  DeFour asserts that the defendants knew immediately after the May 31, 2022, incident that there was no evidence of him assaulting anyone.  Thus, he contends that the following defendants

authorized this lengthy, restrictive detention in violation of his due process rights merely to retaliate against him for protected conduct:  Edmonds, Rosson, Brown, Walker, Moore, Ross, Bryant, and Booker.

When Defour filed grievances about the events in this case, Bryant "constantly denied intake," which DeFour characterizes as "one of many retaliation tactics."  Second Am. Compl. ¶ 51, ECF No. 16.  .  Defour claims that he notified all of the supervisory defendants about the challenged actions by Webber, Stanton, Randolph, and Rosson.  He contends that these administrators either authorized their subordinates' actions or failed to correct DeFour's housing status or disciplinary infractions.  He also complains that they did not sanction Stanton, Randolph, and Rosson for violating unspecified state regulations.

### B. Defendants' Evidence.

On May 26, 2022, at BKCC, Beaty wrote a disciplinary charge against DeFour for threatening to commit aggravated assault against a non-offender, charge number BKCC-2022-0614.  That same day, Beaty encountered DeFour at the property window when DeFour demanded to watch the officers package some of his property for shipping.  The officers allowed him to do so, but when DeFour asked to know the shipping price, Beaty told him she could not give him that information at that time.  DeFour refused to leave the window and said to Beaty, "I don't think you know who I am on this compound, but you fucking with the wrong person, and I am

going to show you that you are fucking with the wrong person, you will regret this. You have no fucking idea."[6]  Beaty Am. Aff. ¶ 4, ECF 74-2.  Beaty called Officer T. Smith to remove him.  Beaty states that because of DeFour's statements, she feared for her life, so she issued the charge against DeFour.

Beaty explains that when she submits a disciplinary charge to VACORIS, the VDOC computer system, she contacts the Watch Office.  She understands that the Watch Commander then decides whether to process the charge as submitted to VACORIS.  Beaty denies that she wrote the charge against DeFour to retaliate against him for any prior grievance or lawsuit or that she conspired with Webber to have the charge authorized.[7]

Webber states that in her capacity as Officer in Charge (OIC) on May 26, 2022, she signed off on the charge that Beaty wrote against DeFour.  Webber explains that to sign off on the charge, the OIC need not have been present during the charged conduct and must merely ensure that the charge is detailed, dated, and

---

[6]  DeFour does not deny making these statements to Beaty.

[7]  Beaty states:

In my previous affidavit, I stated that Lt. Webber signed off as the Officer-in-Charge (OIC) because she was the first ranking officer I saw after writing this charge.  That statement was incorrect.  Although I read the affidavit carefully, I must have missed this statement.  This was an accidental oversight on my part.

Beaty Am. Aff. ¶ 5, ECF No. 74-2.

signed.  Webber denies that she told other inmates that DeFour had reported any other inmate's rule violation.  She also denies that DeFour's litigation or grievances was a factor in her decision to approve the threat charge Beaty submitted.

During the disciplinary hearing on DeFour's charge for threatening assault on Beaty, Stanton reduced the charge to threatening bodily harm to any person verbally or by gesture or actions.  She found DeFour guilty of this offense and imposed a $15 fine.

Rosson, assigned to investigate the May 31, 2022, incident, placed all three inmates in the RHU pending completion of the investigation in accord with VDOC policy.  He reviewed the video that I have already summarized.  Rosson emphasizes thatVickers was already in the C/D building entryway when DeFour and then Pridgen entered it a few minutes later.  Rosson states "[i]t was believed" that in response to the earlier encounter between Vickers and Pridgen at DeFour's cell, as shown on video, these inmates had an altercation in the entryway that then continued out onto the boulevard in front of C/D building.  Rosson Aff. ¶ 4, ECF No. 74-4. Rosson also relied on the video evidence showing that each of the three inmates suffered stab or cut wounds that they did not have before their entryway encounter. On this evidence, Rosson charged each of the inmates with a disciplinary offense: Aggravated Assault Upon an Offender.

Stanton states that she found DeFour guilty of the aggravated assault offense arising from the incident on May 31, 2022. She relied on the video footage of the inmates' earlier encounter in D2 pod and the video showing DeFour without wounds or blood before the altercation and evidence that each of the three inmates had bleeding wounds after their encounter in the entryway. DeFour claimed during the disciplinary hearing that his injuries did not result from the events charged in the report, but Stanton stated that she did not believe his version of events. She sanctioned DeFour with the loss of 90 days of telephone and 90 days of visitation. All three inmates received the same charge and disciplinary penalties, and all three were transferred to the RHU. Rosson and Stanton deny basing their decisions on DeFour's past litigation or grievances.

While in the RHU after the incident on May 31, 2022, DeFour received showers, meals, recreation, access to medical care, and access to other services available to general population inmates. RHU cells are also the same size as the cells in general population.

The aggravated assault offense caused an increase in DeFour's VDOC security level, so he no longer qualified for assignment to the BKCC general population. It took several weeks for officials to locate suitable housing for DeFour at a higher security level facility, given his medical restrictions. On September 13, 2022, officials transferred DeFour from BKCC to Red Onion State Prison.

-11-

*C. DeFour's Claims.*

Liberally construed, DeFour's Second Amended Complaint asserts the following groups of claims for relief:

Claims 1 and 2: Webber was deliberately indifferent to DeFour's safety by telling other inmates that he was an informant, in violation of the Eighth Amendment (Claim 1), and Webber did so in retaliation for his past lawsuits and grievances against her and her staff, in violation of the First Amendment (Claim 2).

Claims 3 and 4: By writing, authorizing, or finding DeFour guilty of the disciplinary charge that DeFour threatened Beaty with bodily harm, Beaty, Webber, Stanton, Moore, Bryant, and Edmonds denied DeFour due process in violation of the Fourteenth Amendment (Claim 3), and they did so in retaliation for his protected conduct, in violation of the First Amendment (Claim 4).

Claims 5 and 6: Defendants Rosson, Brown, Walker, Ross, Moore, Booker, and Edmonds placed DeFour in restorative housing without meaningful review, thereby violating his due process rights (Claim 5), and the defendants did so in retaliation for DeFour's protected conduct, thus violating his First Amendment rights (Claim 6).

Claims 7 and 8: Rosson, Randolph, Stanton, Ross, Bryant, Moore, and Edmonds violated DeFour's Fourteenth Amendment due process rights in various ways related to a disciplinary charge for aggravated assault (Claim 7), and they did

so in retaliation for DeFour's past protected conduct, in violation of the First Amendment (Claim 8).

Claim 9: Bryant denied intake of DeFour's grievances about violations complained of in this lawsuit in retaliation for DeFour's protected conduct and to prevent DeFour from exercising his right to write grievances and petition the court for redress of his grievances, in violation of his First Amendment rights.

## II. MOTIONS FOR SANCTIONS.

DeFour also complains that some defendants have committed perjury in their sworn affidavits or discovery responses and seeks sanctions against those defendants and their attorney. I have reviewed the entire record and the video submitted to the court. I conclude that DeFour's sanctions motions are without merit.

In the first motion, ECF No. 63, DeFour complains that defendant Randolph, who served him with the written disciplinary charge for aggravated assault on May 31, 2022, failed to follow a VDOC procedural requirement to sign a form certifying that DeFour had refused to sign it himself. Available video footage shows Randolph standing at DeFour's door for a lengthy period with paperwork in hand, apparently conversing with him. Randolph has stated in a sworn affidavit that she initially forgot to apply the certification signature but realized the omission and returned to the area moments later to complete it. The video footage in the record is not

inconsistent with Randolph's statement that she returned to the area, and the certification section of the form submitted with the disciplinary records is signed.

At the disciplinary hearing on the assault charge, Stanton relied on the signed copy to overrule DeFour's objections about the certification issue. When DeFour appealed his disciplinary conviction for assault, he complained again about the missing certification. Defendants Bryant and Edwards found no problem with the certification, based on Randolph's explanation and the video, and Bryant made a similar response to DeFour's Request for Admissions. DeFour insists that the video footage does not show Randolph returning to his cell. He claims that based on his interpretation of the video footage, Randolph, Bryant, and Edmonds have committed perjury and that they and their attorney should be sanctioned for knowingly submitting false sworn statements in this case.

In DeFour's second motion, ECF No. 80, he claims that defendant Rosson brought a false assault charge against him and has lied in various document about the evidence. Rosson states that he investigated the May 31, 2022, incident for BKCC and then relayed information about it to the VDOC Special Investigation Unit (SIU). In response to one of DeFour's interrogatories, Rosson stated that he told SIU his belief that Pridgen and DeFour were the assailants based on the video showing Pridgen pulling Vickers into DeFour's cell. . Rosson also stated that based on the video and evidence, any one of the three inmates "could have injured either

one of the others." Mot. Attach. No. 1, at 3, ECF No. 80-1.  DeFour claims that SIU allegedly found that DeFour and Pridgen appeared to be victims in the incident. DeFour also contends that the defendants knew from their internal reports that he was a victim in the incident but submitted false affidavits about the incident.  Finally, DeFour accuses defense counsel of suborning perjury by submitting responses that she knew or should have known were inconsistent with each other and video.

In DeFour's third motion, ECF No. 94, he faults defendant Rosson for a statement in his affidavit indicating that video footage of the May 31, 2022, incident shows DeFour in an altercation.   Yet, in interrogatory responses and in the disciplinary hearing, Rosson admitted that no video footage shows DeFour making physical contact with any other inmate.  DeFour claims that Rosson in one sworn statement claims video shows the altercation, and then in another statement, admits there is no video of the assault for which he charged DeFour.

DeFour also faults Bryant for stating in her initial affidavit that DeFour did not appeal her intake rejection of a Regular Grievance.  In an Amended Affidavit, Bryant says she overlooked this misstatement of events when reviewing her affidavit; she later revised her testimony to indicate that DeFour did appeal her intake decision, and she attached a different copy of the Regular Grievance that includes DeFour's appeal and the reviewer's finding that upheld Bryant's intake decision.

I construe DeFour's motions as seeking sanctions under Federal Rule of Civil Procedure 56(h).  Under this rule, a district court may sanction a party or an attorney if an affidavit or declaration filed in connection with a motion for summary judgment "is submitted in bad faith or solely for delay."  Fed. R. Civ. P. 56(h).  "Awarding sanctions under Rule 56(h) is rare," reserved only to punish "egregious" conduct. *Williams v. Trujillo*, No. 2:18-cv-03239, 2022 WL 1154800, at *3 (D. Ariz. Apr. 19, 2022).  For example, courts have found bad faith "where affidavits contained perjurious or blatantly false allegations or omitted facts concerning issues central to the resolution of the case."  *Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317, 327 (S.D.N.Y. 2012).

At the most, DeFour highlights differences between his interpretation of the video footage or the defendants' terminology in describing that evidence.  In DeFour's view, video does not show Randolph standing a second time at DeFour's cell door on May 26, 2022, so he believes the defendants' statements about Randolph's certification explanation being bolstered by the video are false. Similarly, DeFour claims that video does not show him making physical contact with Vickers, so he claims Rosson's statements that video shows inmates involved in an altercation are false.  DeFour asserts that Bryant purposely lied in her initial affidavit to mislead the court.  And for these reasons, DeFour claims, the defendants' counsel knew or should have known that the affidavits she submitted contained perjury.

-16-

First, DeFour is inappropriately asking the court to do what it cannot do on summary judgment — to determine the accuracy and sufficiency of the evidence presented.   It is well established that the court "may not make credibility determinations" in reviewing the record on summary judgment. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

More importantly, DeFour's contentions do not support sanctions against anyone.  He simply has not demonstrated that any defendant or that defense counsel presented any blatantly false evidence or that they submitted any evidence in bad faith or for purposes of delay.  The video speaks for itself, as does Randolph's statement that she later returned to complete the certification process.  Rosson wrote the aggravated assault charge based primarily on unrefuted circumstantial evidence (including video) that three inmates entered the entryway without injury when some sort of encounter occurred between them, leaving three inmates with wounds that they did not previously have.  All three inmates received the same charges and penalties since none of them would provide evidence against the others.  I find no indication that Rosson made any statement to the SIU or the court with any intent to mislead or delay proceedings.[8]  Similarly, I do not find any evidence showing that

---

[8]  In DeFour's most recent submission, he states that on August 15, 2023, Rosson testified at a jury trial in Buckingham County Circuit Court that no video exists showing DeFour physically contacting anyone on May 31, 2022, and that no witness has described him as doing so.  Resp. 2, ECF No. 103.  Online state court records indicate that DeFour was indicted under Va. Code Ann. § 18.2-41, which states: "Any and every person

Randolph or the defendants who reviewed her certification of the charge acted in bad faith with intent to mislead or delay proceedings.  And DeFour simply offers no evidence on which I can find that Bryant's submission of an Amended Affidavit and counsel's submission of amended memorandums and affidavits represent blatant perjury or bad faith intended to mislead or delay.  Accordingly, I will deny DeFour's motions seeking sanctions.

### III.  THE SUMMARY JUDGMENT STANDARD.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, "[t]he court must

---

composing a mob which shall maliciously or unlawfully shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disable, disfigure or kill him, shall be guilty of a Class 3 felony." DeFour states that a jury acquitted him of this criminal charge based on the same evidence used to support his disciplinary charge for aggravated assault under VDOC procedures.  DeFour argues that Rosson's testimony at trial and the jury's findings somehow bolster the contention that Rosson committed perjury during the disciplinary proceedings and this civil case.

I find no merit to this argument.  As indicated, at the summary judgment phase of a civil case, the court cannot make credibility judgments about seemingly inconsistent statements or descriptions or video clips.  Also, as I explain in more detail later in this Opinion, the measure of evidence necessary to find an inmate guilty of a prison disciplinary offense is not the same as the evidentiary standard triggered by criminal charges. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.").  Neither Rosson's trial testimony as DeFour reports it nor DeFour's acquittal alters my conclusion that sanctions are not warranted against Rosson or his attorney in this case.

-18-

construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023). The court "may not weigh the evidence or make credibility determinations." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).

A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, a party must "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his or her favor. *Id.* Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

A pro se litigant's verified complaint and amended complaint, or other verified submissions, must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). Where a pro se plaintiff fails to respond to a defendant's specific evidence contradicting the allegations of the complaint, that defendant may be entitled to summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992). "A pleading that

-19-

offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES.

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies.  This exhaustion requirement is "mandatory," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and "applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the prison facility provides to its inmates and meet all deadlines within that procedure.  *Woodford v. Ngo*, 548 U.S. 81, 90–94 (2006).  Even if the particular form of relief the inmate seeks in his lawsuit is not available through the prison's grievance proceedings, he must, nevertheless, properly exhaust all available remedies under that procedure before bringing a civil action in this court.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).

VDOC Operating Procedure (OP) 866.1 is the written administrative remedies procedure that inmates must follow to comply with § 1997e(a).  Bryant Am. Aff. Encl. A, ECF No. 74-11.  All issues are grievable except disciplinary proceedings and matters outside the control of the VDOC.  Under OP 866.1, an inmate with a grievance about some event or issue must first make a good faith effort to resolve

-20-

his concerns informally, which he may do by completing a Written Complaint form and submitting it to prison staff. He should receive a written response on the bottom of the written complaint form within fifteen days to allow him to initiate the formal grievance procedure by filing a Regular Grievance (with the Written Complaint form or any other relevant documentation attached).

A Regular Grievance must be filed within thirty days of the occurrence about which it complains. It is date-stamped on the working day it is received by the prison's grievance department. If a Regular Grievance does not comply with the filing requirements of OP 866.1, it will be rejected at intake and returned to the inmate within two working days from the date of receipt. The respondent will note on the back of the form the reason for rejection (expired filing period, more than one issue raised, etc.). The respondent will also instruct the inmate how to remedy any problems with his submission, if feasible, so that the inmate can correct the issue and resubmit the Regular Grievance. If the inmate disagrees with the intake decision, he may send the Regular Grievance to the Regional Ombudsman for review of that decision. There is no further appeal of an intake decision, and an appeal of the intake decision does not satisfy the exhaustion requirement.

Once the Regular Grievance is accepted at intake, the warden or his designee will investigate the complaint it contains and send the inmate a Level I response. If the responding official determines the grievance to be unfounded, the inmate has

five days to submit the Regular Grievance and attachments on appeal to Level II, to an appropriate VDOC official such as the Regional Ombudsman or other administrator, depending on subject matter.  In most cases, this Level II review is the final available level of appeal.  For full exhaustion, the inmate must submit his claim via a Written Complaint, then in a Regular Grievance, and then through all available levels of appeal in OP 866.1.

The defendants assert that DeFour failed to exhaust administrative remedies as to Claims 1 and 2, concerning defendant Webber.  The defendants' evidence is that Defour submitted a Written Complaint, Log No. BKCC-22-INF-01216, on June 21, 2022.  This complaint stated that an inmate came to DeFour's cell on May 31, 2022, upset because Webber had told the inmate that several others, including DeFour, had informed Webber that the inmate had broken rules.  DeFour wrote that Webber's actions placed him in harm's way and created an unsafe condition.  On June 27, 2022, an officer responded to the Written Complaint, stating that Webber reported knowing nothing of the incident until after the later encounter between DeFour and two other inmates occurred.

DeFour filed a Regular Grievance on June 29, 2022, about the issues raised in BKCC-22-INF-01216.  Bryant rejected this Regular Grievance at intake, noting that it did not show how the issue had affected DeFour personally.  DeFour appealed this intake decision, but the Regional Ombudsman upheld Bryant's ruling.  Bryant states

that DeFour did not attempt to file any other, more detailed Regular Grievance on his contention that Webber's actions had placed him in harm's way.

In response to the defendants' evidence, DeFour contends that Bryant's rejection was inaccurate, because he believes that he did show how Webber's actions affected him. Like the Written Complaint, the Regular Grievance stated that Webber's actions "put [DeFour] in harms [sic] way" and "created an unsafe condition for [DeFour] and others." Bryant Am. Aff. Encl. B, at 23, ECF No. 74-11. DeFour insists that Bryant's intake rejection of this Regular Grievance was unsupported by facts and was, therefore, merely obstructive or retaliatory. I do not agree. This Regular Grievance form does not describe any event stemming from Webber's actions that caused harm to DeFour. Moreover, Bryant noted the reason for the rejection, allowing DeFour an opportunity to submit a revised Regular Grievance describing the harm that Webber's actions allegedly caused him.

In another responsive pleading, DeFour asserts that at some unspecified date, he wrote a revised Regular Grievance about Webber's actions on May 31, 2022. But instead of submitting this grievance to the BKCC grievance department as required by procedure, he allegedly sent it to the warden's office. DeFour does not provide a copy of the revised Regular Grievance about Webber or recite its contents. Nor does he provide evidence that this revised grievance arrived for proper processing at

the BKCC grievance department within the prescribed time period, if ever.  Instead,

DeFour submits a letter from the warden's office, dated August 30, 2022, that states:

> Please note that your most recent letters (8/4/22-8/10/22) regarding
> Written Complaints, Grievance and request for investigation and
> sanction of IHO Forbes-Stanton were received.  As far as your
> complaints and Grievances are concerned, they have been forwarded to
> the Grievance Department and you will not be time-barred.

Stmt. Disp. Facts, Attach. T, at 52, ECF No. 64-2.  Moreover, DeFour provides no

information about any response to his purported, revised Regular Grievance about

Webber or show that he appealed that response.

On the evidence before me, I find no material dispute of fact on which DeFour

could establish that he timely filed a Regular Grievance about Webber's alleged

actions on May 31, 2022, that met the intake requirement to show how her actions

personally affected him.  He provides no document or statement refuting the

defendants' evidence that the Grievance Department did not receive any other

Regular Grievance from him about Webber's actions.  And the warden's letter,

concerning documents received in his office months after the May 31 incident, does

not indicate that any of those documents concerned the allegations against Webber.

DeFour could survive summary judgment for failure to exhaust if he shows

that the remedies under the established grievance procedures were not "available" to

him.  *Ross*, 578 U.S. at 642.  An administrative remedy is not available "if a prisoner,

-24-

through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

DeFour asserts that Bryant often improperly rejected grievances at intake, allegedly making that procedure unavailable to him. Specifically, he presents a grievance in which he complained that Bryant was wrongfully rejecting grievance documents. Bryant rejected this Regular Grievance at intake because complaints about grievance intake decisions are nongrievable. Stmt. Disp. Facts, Attach. C(7), at 10, ECF No. 64-2. DeFour's mere characterization of Bryant's grievance responses as obstructive or retaliatory does not demonstrate that the process itself is unavailable. Indeed, the defendants' evidence demonstrates that he has successfully filed grievances and appeals through the VDOC administrative remedy procedures.

DeFour bears the burden of proving that the exhaustion requirement should be excused based upon the unavailability of administrative remedies. *Woodhouse v. Duncan*, No. 7:17-CV-00129, 2018 WL 1513009, at *3 (W.D. Va. Mar. 27, 2018), *aff'd*, 741 F. App'x 177 (4th Cir. 2018) (unpublished). He has not carried this burden. I will grant the defendants' Motion for Summary Judgment as to Claims 1 and 2 based on my finding that DeFour failed to exhaust administrative remedies on these issues.

## V.  PROCEDURAL DUE PROCESS AND QUALIFIED IMMUNITY.

In Claims 3 and 7, DeFour asserts that some defendants violated his due process rights during disciplinary proceedings.  In Claim 5, he asserts that another group of defendants placed and maintained him in the RHU without providing him procedural protections required by the Constitution.  The defendants assert that these claims must be dismissed as without merit or that the defendants are entitled to qualified immunity.  After review of the record, I will grant the defendants' summary judgment motion as to these due process claims.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated the aggrieved party's constitutional rights.  *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Qualified immunity shields government officials from claims for monetary damages "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam).  To invoke qualified immunity, a defendant must demonstrate: (1) the facts alleged by the plaintiff do not state a claim that the defendants violated a constitutional right, and/or (2) the right at issue was not clearly established at the time of the defendant's conduct. *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  In other words, a plaintiff must identify a sufficient liberty or property interest at stake before the court examines whether the procedures attendant to deprivation of that interest were constitutionally sufficient.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  A prison inmate demonstrates a protected interest by showing it involves an "atypical and significant hardship . . . in relation to ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

### A.  The Threat Charge.

In Claim Three, Defour contends that various defendants violated his due process rights during the disciplinary proceedings on the charge that he threatened bodily harm against Beaty on May 26, 2022.  I find that qualified immunity as asserted by the defendants bars this claim.

Neither the Supreme Court nor the Fourth Circuit has specified the monetary threshold at which the Due Process Clause is implicated when it comes to fines against inmates for disciplinary infractions.  *Allen v. Fields*, No. 7:21-CV-00207,

2022 WL 4485181, at *4 (W.D. Va. Sept. 27, 2022).  It follows that no reasonable prison official in 2022 would have known that an inmate was entitled to constitutionally required procedural protections during disciplinary proceedings that resulted in no penalty other than a small monetary fine.  *Bowling v. Clarke*, No. 7:19CV00453, 2021 WL 440794, at *5 (W.D. Va. Feb. 8, 2021) (holding that defendants were entitled to qualified immunity as to due process claims related to a small disciplinary fine).

After finding DeFour guilty of the charge that he threatened Beaty with bodily harm, Stanton imposed a $15 fine.  As relief for his due process challenges to the disciplinary process on this charge, DeFour seeks monetary damages.  He has not demonstrated, however, that it was clearly established on May 26, 2022, that he was entitled to federally required procedural protections before receiving a disciplinary fine of $15.  Therefore, the defendants are entitled to qualified immunity, and I need not address DeFour's constitutional claims that he was deprived of particular procedures before incurring this fine.   *Ky. Dep't of Corr.*, 490 U.S. at 460. Moreover, even if the defendants somehow violated VDOC procedural rules related to this disciplinary proceeding, such violations of state law do not give rise to any federal due process issue actionable under § 1983.  *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990).  Therefore, I conclude that the defendants are

entitled to qualified immunity against DeFour's claims for monetary damages and will grant their summary judgment motion as to Claim 3.

### B. The Aggravated Assault Charge.

In Claim 7, DeFour asserts that various defendants violated his due process rights during the disciplinary proceedings on the assault charge related to the incident on May 31, 2022. After Stanton found DeFour guilty of this offense, she penalized him with the loss of telephone and visitation privileges for 90 days.

Inmates do not have a protected liberty interest in avoiding penalties that involve a temporary loss of telephone usage and visitation. *Moone v. Woodson*, Case No. 7:20CV00762, 2021 WL 5049770, at *2 (W.D. Va. Nov. 1, 2021), *aff'd* No. 21-7691, 2022 WL 910915 (4th Cir. Mar. 29, 2022) (unpublished) (finding 90-day loss of commissary and telephone privileges did not create a federally protected liberty interest); *Dunford v. McPeak*, Civil Action No. 7:08cv00018, 2008 WL 204481, at *2 n.6 (W.D. Va. Jan. 24, 2008) (finding no protected liberty interest in avoiding loss of visitation privileges for 90 days). Because a temporary loss of visitation and telephone privileges are the only penalties imposed on DeFour from the finding of guilt on the aggravated assault charge, he has not demonstrated deprivation of a protected liberty interest related to that charge. Therefore, he has no actionable claim that the procedures provided during disciplinary proceedings on that charge were not constitutionally sufficient. *Ky. Dep't of Corr.*, 490 U.S. at 460. Furthermore, even

if the defendants' actions or omissions during those proceedings did not comply with VDOC procedural regulations in some way, such alleged violations of state law do not support any claim independently actionable under § 1983. *Riccio*, 907 F.2d at 1469. Therefore, I will grant summary judgment for the defendants as to Claim 7.

### C. Separate Housing.

DeFour contends in Claim 5 that various defendants placed him in the RHU and kept him there for weeks in violation of his due process rights. DeFour states that defendants kept him in "segregation," "in the most restrictive housing," and in "isolated confinement," although they knew that he was a victim in the May 31, 2022, incident with Vickers. Second Am. Compl. ¶¶ 45, 56, ECF No. 16. The defendants argue that DeFour's assignment to the RHU from May 31 to September 13, 2022, a total of three and a half months, did not implicate any constitutionally protected liberty interest. I agree.

As stated, although prisoners are afforded some due process rights related to conditions of incarceration, those liberty interests are limited to avoiding conditions that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. DeFour's pleading does not state facts showing that conditions in the RHU were so harsh as to qualify as atypical when compared to conditions elsewhere at BKCC. In addition, undisputed evidence shows that his stay in the RHU was less than four months and was

lengthened when compared to Pridgen and Vickers by the need to find DeFour higher security housing that also met his medical needs.  Moreover, mere limitations on privileges, property, and activities for restrictive housing inmates do not constitute "atypical and significant" hardship in relation to the ordinary incidents of prison life as required to create a liberty interest, triggering federal due process protection.  Temporary assignment to restricted housing for administrative reasons, in conditions similar to the general population as DeFour experienced, simply does not exceed the sentence imposed on him in such an extreme way as to give rise to the protection of the Due Process Clause by its own force.  *Id.* at 486; *see also Beverati v. Smith*, 120 F.3d 500, 503–04 (4th Cir. 1997) (holding that segregated confinement for administrative reasons for six months in cells with vermin, human waste, flooding toilet, excessive heat; and dirty clothing, linens, and bedding; with longer periods in cell and no outside recreation; with no educational or religious services; and with cold food in smaller portions was not so atypical as to impose significant hardship as required for liberty interest under *Sandin* analysis).

Finally, even if officials did not comply with some state rule in processing his classification changes, housing assignment to RHU, and transfer, such state rule violations do not support any actionable claim under § 1983.  *Riccio*, 907 F.2d at 1469.  I will grant the defendants' summary judgment motion as to any claim that

the challenged status change and housing assignments deprived DeFour of a protected liberty interest without due process.

## VI.  GRIEVANCE RESPONSES.

In Claim 9, DeFour asserts that Bryant's handling of his grievances interfered with his constitutional rights to file such prison complaints and to petition the court. I find no merit to this claim.  It is well established that inmates have no constitutional right to a prison grievance procedure or to access an existing procedure.  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017).  DeFour also has no viable § 1983 claim based on any contention that Bryant failed to comply with VDOC grievance procedures.  *Riccio*, 907 F.2d at 1469.  I will grant summary judgment for Bryant as to the allegations in Claim 9 that her grievance responses violated DeFour's rights to due process or access to courts.

## VII.  RETALIATION AND CONSPIRACY.

DeFour asserts retaliation claims associated with each of his other claims against the defendants, contending that the defendants acted as they did to retaliate against him because he was generally known and disliked for having filed lawsuits and complaints about prison officials.  Merely conclusory allegations of retaliation or bias cannot suffice to state any actionable claim under § 1983.  *Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994).  To succeed on his retaliation claims in this case, DeFour must establish against each defendant that "(1) [DeFour] engaged in

protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (*Martin II*) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (*Martin I*)). But courts must treat an inmate's claim of retaliation by prison officials "with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).

To meet the first element of the retaliation analysis, the plaintiff must show that he exercised his First Amendment rights. Prison officials may not retaliate against an inmate for exercising his constitutional right to access the court, *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978), nor may they take actions that violate his "First Amendment right to be free from retaliation for filing a grievance." *Booker*, 855 F.3d at 541.

The second, adverse action element of the retaliation standard is objective. Specifically, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The plaintiff's continued exercise of his rights in the wake of the alleged retaliatory conduct provides some evidence

of the tendency, or lack thereof, of that conduct to chill First Amendment activity, but it is "not dispositive" of this objective element of the analysis. *Id.*

The third element of the standard requires the plaintiff to show a causal connection between his First Amendment activity and the alleged adverse action. A plaintiff must put forth evidence to show that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action." *Martin II*, 977 F.3d at 300. "Temporal proximity may be enough to sufficiently make a prima facie showing of causation." *Riddick v. Mickles*, No. 7:20-cv-00559, 2023 WL 2759069, at *9 (W.D. Va. Mar. 31, 2023).

"At this point in the retaliation analysis, the burden of proof shifts to the defendant to show a legitimate, nonretaliatory reason for taking adverse action" against the plaintiff. *Id.* If the defendant does so, the plaintiff then must resume the burden of proof and must show by a preponderance of evidence that the defendant's stated reason is merely a pretext for unlawful retaliation. *Id.*

If the defendant meets the prima facie case with evidence of a nonretaliatory reason for the alleged adverse action, the burden falls back on the plaintiff to show that "the defendant's stated reason is merely a pretext for unlawful retaliation." *Id.* At this point, mere temporal proximity between the protected activity and the adverse action is not sufficient to support a reasonable inference of pretext. *Id.* Similarly, the plaintiff's bald assertions of retaliatory motive cannot refute evidence

of legitimate nondiscriminatory reasons for a defendant's adverse action. *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1288 (4th Cir. 1985).

The defendants assert that DeFour has not stated facts to support any prima facie retaliation claim. I have carefully reviewed DeFour's many submissions, and I agree with the defendants. The protected conduct aspect of DeFour's retaliation claims against most of the defendants rests on his conclusory and self-serving contention that in May 2022, everyone at BKCC knew about prior lawsuits and grievances that he had filed against prison officials. He provides no independent factual matter showing how each defendant would have known of his protected conduct. His "naked assertions devoid of further factual enhancement" claiming that he had a reputation for filing lawsuits and grievances are the very type of unsupported contention that cannot demonstrate the personal involvement necessary to a viable § 1983 claim. *Iqbal*, 556 U.S. at 678. This finding alone supports dismissal of the majority of DeFour's retaliation claims.

Some of DeFour's retaliation clams are more particularly tied to a defendant's actions, however, thus warranting further discussion. In Claim 4, DeFour asserts that Beaty brought a disciplinary charge against him to retaliate against him for statements he made to her over their disagreement about his property shipment on May 26, 2022. If DeFour had indicated his intent to file a grievance about Beaty, such a statement might qualify as constitutionally protected conduct for the basis of

a retaliation claim. *Booker*, 855 F.3d at 541.  However, DeFour does not dispute

Beaty's version of his comments to her.  DeFour argues that because his comments

to Beaty did not state explicitly that he intended to physically assault her, they did

not provide sufficient evidence to support a charge of threatening bodily harm.  On

that basis, he argues that Beaty must have written the charge merely to retaliate

against him.

I do not agree.  It is well established that evidentiary findings behind a prison

disciplinary ruling are constitutionally sufficient if the hearing officer's decision was

based upon "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S.

445, 455 (1985).  DeFour's statements to Beaty clearly implied his intention to

convey to her that he could and intended to take steps to punish her for her actions.

I find no justification to accept DeFour's argument that a threat of bodily harm must

include the word harm or a description of harm.  I also find that Beaty's inference

that DeFour was threatening to harm her in some way was not unreasonable or

without basis in fact.  Therefore, I conclude that the defendants had some evidence

to support a disciplinary charge that DeFour had threatened harm against Beaty and

to support upholding that charge.  As such, I find that they have shown a legitimate

and nonretaliatory reason for their actions, and that DeFour fails to show that this

reason was merely pretextual.  Therefore, I will grant summary judgment on the

retaliation claims related to the threat charge that Beaty brought against DeFour.

I will also grant summary judgment for the defendants on retaliation claims related to the aggravated assault charge stemming from the incident on May 31, 2022.  DeFour contends that because these defendants did not have witness testimony or video evidence showing that he physically assaulted anyone, the charge and penalties upheld on appeal were clearly retaliatory.  However, as Stanton stated during the disciplinary hearing on this charge, she could legitimately find DeFour guilty of aggravated assault if she found it more likely than not, from the available evidence, that he committed an aggravated assault against someone.  To review, the evidence in the record shows that three inmates went into the entryway uninjured, had some sort of scuffle not clearly depicted on camera, and then emerged from the entryway with bruises and/or puncture wounds, some of which were serious. DeFour pleaded not guilty to assaulting anyone.  He agreed that he suffered injuries that day, but he denied that they arose from incidents in the disciplinary report. Stanton stated that she did not believe DeFour's claim about his injuries and found him guilty.

I cannot find that DeFour has proven any retaliatory motive.  Officials charged all three inmates with aggravated assault, imposed the same disciplinary penalties (loss of telephone and visitation privileges), and placed each of them in the RHU. Officials had some evidence on which to believe that the three inmates assaulted each other, based on video proving encounters between them on May 31, 2022, and

the injuries they all exhibited after their final encounter. *Hill*, 472 U.S. at 455. DeFour complains that the other two inmates were transferred to a prison facility less restrictive than his and did not remain in the RHU at BKCC as long as he did. However, DeFour does not refute the defendants' evidence that his transfer could not occur until officials arranged a housing assignment that met both his new security level and his medical needs. I find no disputed fact in the record on which DeFour could persuade a fact finder that the defendants brought or sustained the aggravated assault charge against him to retaliate against him for prior lawsuits or grievances.

For similar reasons, I will also grant summary judgment on DeFour's claims that anyone placed or maintained him in the RHU for retaliatory reasons. He offers no evidence to refute the defendants' affidavits showing that the aggravated assault charge caused an increase in his VDOC security level classification that disqualified him from remaining in the general population at BKCC or that his transfer elsewhere was delayed by efforts to accommodate his medical needs.

Finally, I conclude that DeFour's retaliation claim against Bryant also lacks merit. He complains that Bryant rejected some Regular Grievances at intake for incomplete information (failing to show how the action of which he complained affected him personally). These complaints, however, represent nothing more than disagreement with Bryant's interpretation of the text of the document. Moreover,

after each such rejection, DeFour had the option to revise and resubmit the Regular Grievance to correct the shortcoming that Bryant noted. These facts simply do not prove that Bryant responded to grievances as she did merely to retaliate for DeFour's prior lawsuits or grievances.

For the reasons stated, I will grant the defendants' summary judgment motion on DeFour's retaliation claims.

Finally, I will grant summary judgment to the defendants on DeFour's claims that the defendants conspired with each other to deprive DeFour of constitutional rights. To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants acted "jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the deprivation of a constitutional right." *Glassman v. Arlington Cnty.*, 628 F.3d 140, 150 (4th Cir. 2010). When the court concludes that all the plaintiff's constitutional claims are without merit, his conspiracy claims are also without merit. *Id.*

VIII. DEFOUR'S PARTIAL SUMMARY JUDGMENT MOTIONS.

DeFour has moved for summary judgment against Stanton, Randolph, Bryant, and Edmonds, ECF No. 62, based on his argument that Randolph did not properly certify serving the assault charge on him in light of his refusal to sign paperwork. DeFour also moves for summary judgment against Rosson, ECF No. 80, contending that this defendant knew no evidence supported the aggravated assault charge he

brought against DeFour.  For reasons already discussed, I have found that DeFour had no protected liberty interest at stake in the disciplinary proceedings on the assault charge.  I have also found that he has no actionable § 1983 claim based on Randolph's alleged violation of a state procedure requirement regarding certification of a disciplinary charge.  *Riccio*, 907 F.2d at 1469.  For these reasons, I will deny DeFour's summary judgment motions against these defendants.

## IX.   CONCLUSION.

For the reasons stated, it is hereby **ORDERED** as follows:

1. The Clerk shall amend the docket to indicate that defendant Bates is now known as defendant Beaty; to clarify references to this defendant, the docket will list both names;

2. The defendants' Motion for Summary Judgment, ECF No. 46, is GRANTED;

3. DeFour's motions seeking partial summary judgment, ECF Nos. 62 and 80, are DENIED; and

4. DeFour's motions seeking to sanction defendants or defense counsel, ECF Nos. 63 and 94, are DENIED.

A separate Judgment will be entered herewith.


ENTER:   September 20, 2023

/s/  JAMES P. JONES
Senior United States District Judge